**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ANDYPOLO LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-3556 |
| | § | |
| CARAVAN RUG CORPORATION, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Diamonds may be a best friend for some, but the diamond necklace at issue here has created little but enmity and litigation. Andypolo LP, an investment-holdings company, hired two brothers, Babak and Siamak Nouri, to investigate investment opportunities in rugs and tapestries. Babak Nouri expanded the search to jewelry and found a 43-carat diamond necklace at L'Amor Jewelry in Beverly Hills, California. L'Amor quoted a $2.2 million sales price for the necklace and brought it to Houston for Andypolo to inspect. A Purchase Agreement for the necklace was eventually executed. Andypolo paid $3.526 million to three entities identified in the Purchase Agreement as "Sellers"– $1.06 million to Noor Gems International, Inc.; $1.95 million to L'Amor; and $508,000 to Caravan Rug Corporation. Andypolo wired $1.95 million to L'Amor, which sent the necklace to Andypolo. Andypolo later learned that L'Amor was the only owner of the necklace. L'Amor did not know the Purchase Agreement existed and believed that it was selling the necklace to Andypolo for $1.95 million. In this lawsuit, Andypolo alleges that it was defrauded of the more than $1.5 million it paid to the two "Sellers" that had no ownership claim to the necklace.

The Third Amended Complaint names as defendants Caravan Rug Corporation, Yahya Noor, the owner of Noor Gems, Inc.; and two others involved in the transactions.  Caravan Rug, Noor Gems, and Yahya Noor counterclaimed.

The following dispositive motions are pending:

> 1.      Andypolo's motion for partial summary judgment as to Caravan Rug's contract-based counterclaims, (Docket Entry No. 48);
>
> 2.      Andypolo's motion for summary judgment as to Yahya Noor's counterclaims and to dismiss or for summary judgment as to Noor Gem's counterclaims, (Docket Entry Nos. 60, 61);
>
> 3.      Yahya Noor's motion for summary judgment as to Andypolo's claims, (Docket Entry No. 63);
>
> 4.      Caravan Rug's motion to dismiss the complaint, (Docket Entry No. 66);
>
> 5.      Andypolo's motion for summary judgment on its contract claim against Caravan Rug, (Docket Entry No. 58); and
>
> 6.      Caravan Rug's motion for summary judgment as to Andypolo's claims, (Docket Entry No. 71).

Based on the pleadings, the motions, replies, and responses, the oral argument of counsel, and the applicable law, the court grants Andypolo's motions as to Caravan Rug's, Noor's, and Noor Gem's counterclaims, and denies Noor's and Caravan Rug's motions to dismiss and for summary judgment as to Andypolo's claims. A scheduling and status conference is set for **September 19, 2014, at 8:30 a.m.**

The reasons are explained below.

## I.      Background

### A.      Andypolo, David Houston, and the Nouri Brothers

David Houston manages Andypolo.  (Docket Entry No. 68-6, Ex. C., at 2, 4–5; Houston Depo. Tr. 22, 26, 28).  Andypolo has no employees.  (*Id.* at 3; Tr. 23).  Andypolo's only limited partner is the Exsontoo Trust.  Dr. Ed Bosarge and his wife, who keep a Houston residence, are the beneficiaries of the Exsontoo Trust.  (*Id.*)  Andypolo manages investments for the Bosarges' benefit.  (*Id.* at 4–5; Houston Depo. Tr. 26, 28).  Dr. Bosarge sits on the Exsontoo Trust's Investment Committee and approves Andypolo's investments.

In 2008, Dr. Bosarge introduced Houston to Babak and Siamak Nouri (the "Nouri Brothers").  (*Id.* at 7; Tr. 41).  The Nouri Brothers owned and operated the Nouri Antique Rug Gallery in Houston after their father, Mohammad Nouri, passed away.  David Houston appointed the Nouri Brothers "as agents looking for investments in the rug and tapestries sector."  (Docket Entry No. 68-6, Ex. C., Houston Depo. at 8, 16; Tr. 61, 69).  Houston was the only person at Andypolo with the authority to designate agents.  (*Id.*).  No written agency agreement was drafted or signed.  Houston's testimony suggests that the Nouri Brothers decided on their own to pursue jewelry investments as well as rugs and tapestries.  (*Id.*).

**B.**   **Babak Nouri Finds a Diamond Necklace**

In 2009, unbeknownst to Andypolo, Babak Nouri contacted Mois Refoua, the vice-president of Caravan Rug Corporation, located in Beverly Hills, California, to help locate investment-grade jewelry for Andypolo.  (TAC ¶ 12).  Caravan Rug sells high-end rugs from Afghanistan and the Middle East.  (Docket Entry No. 68-2, Refoua Affidavit, ¶ 1).  Since 2001, Caravan Rug has distributed its rugs through the Nouri Antique Rug Gallery and had done business with Mohammad Nouri.  (*Id.* ¶ 2).  After Mohammad Nouri died, Refoua worked with the Nouri Brothers. According

to his affidavit, he "trusted" them.  (*Id.*).  Babak told Refoua that Caravan Rug would receive a commission for any jewelry transaction it facilitated.  (*Id.* ¶ 3).

According to Refoua, Babak Nouri "portrayed himself as a very wealthy, successful, sophisticated businessman"and "was well known in the rug industry for purchasing and selling high dollar rugs and tapestries for a variety of different companies."  (*Id.* ¶ 9).  Refoua testified that Babak Nouri said that he owned several Houston entities and was acting on behalf of one of his own Houston-based companies.  (*Id.*).  Refoua testified that he believed Babak Nouri was asking Caravan Rug to find jewelry for his own investments.  Refoua did not know that Babak Nouri was looking for jewelry for someone else.  Refoua believed that Babak Nouri was wealthy enough to purchase millions of dollars worth of jewelry for his own benefit.  (Docket Entry No. 68-5, Ex. B, Refoua Dep., at 10–14, Tr. 38–41).

Refoua contacted various business acquaintances to help locate a suitable piece of jewelry. He contacted Shahram (last name unknown), who is named as a defendant in this lawsuit but not served.  (*Id.* at 13–15, Tr. 41–43).  Through Shahram, Refoua introduced Babak Nouri to Kourosh Zoghi, who owned L'Amor Jewelry, Inc. in Los Angeles, California.  (*Id.* at 15, 17; Tr. 43, 59). Kourosh Zoghi showed Nouri a necklace that L'Amor's jewelers had fashioned featuring a 43.18 carat, Natural Fancy Intense Yellow Radiant diamond from Sotheby.  (TAC ¶15; Docket Entry No. 65-5, Refoua Dep., at 17, Tr. 59).  L'Amor quoted Nouri a $2.2 million sales price for the necklace. (TAC ¶¶ 13–14; Docket Entry No.  68-7, Ex. D., ¶¶ 2, 4, 6).

### C.    The Necklace Comes to Houston

According to Kourosh Zoghi, "Refoua and [Babak] Nouri wanted to show the necklace to their client, the ultimate buyer, in Texas."  (Docket Entry No.  68-7, Ex. D., Zoghi Aff.,¶ 4).

4

According to Refoua, "Babak Nouri wanted to take the Necklace back to Houston to be inspected." (Docket Entry No. 68-2, Refoua Aff., ¶ 4). Refoua's deposition testimony is consistent with his position that he believed Babak Nouri was considering the necklace as an investment for his own company. Kouroush Zoghi at L' Amor agreed that he would take the necklace in an armored truck to Houston. (*Id.* ¶ 4).

When the necklace arrived in Houston sometime in November 2009, Dr. Bosarge, Heather Deen, and Andypolo's lawyer, Eric Shaeffer, met with Babak Nouri and Kouroush Zoghi to inspect and talk about the necklace. (Docket Entry No. 68-6, Ex. C., Houston Dep., at 24, Tr. 115). The details about this meeting are unclear and disputed, including who was present and what was discussed. According to Refoua, Caravan Rug was not involved in the Houston meeting, and Refoua did not know any of the details. (Docket Entry No. 68-5, Ex. B, at 19–24, Refoua Depo. Tr. 65–66). David Houston, allegedly the only person with authority to bind Andypolo, did not attend. (Docket Entry No. 68-6 at 49, 54–550; Houston Depo. Tr. 223; 256–57). Dr. Bosarge did attend, but Houston had trouble remembering any details Dr. Bosarge told him about the meeting. The summary judgment evidence about this meeting consists of hearsay testimony—what Babak Nouri told Refoua and what Dr. Bosarge told Houston. The summary judgment evidence does not include testimony from Babak Nouri or Dr. Bosarge, who were present. Kourosh Zoghi, who was also present, did not provide any details about what was discussed.

Houston stated that a sales price for the necklace was "probably" discussed at the meeting, but he could not recall exact figures and did not identify any agreed price. Babak Nouri later communicated the final sales price to him. This is consistent with Kourosh Zoghi's testimony that all price negotiations took place with Babak Nouri. (Ex. D. at 2 ¶ 5).

Citing Houston's deposition, Caravan Rug asserts that Dr. Bosarge negotiated and agreed on a $3.526 million price for the necklace at the meeting and understood how much each of the three sellers would be paid. Andypolo disputes that assertion. The summary judgment evidence is, as noted, both unclear and disputed on this point. Neither Houston and Refoua was at the meeting. Houston did not know what was discussed. Houston's testimony does not establish that at the meeting, the parties negotiated, much less agreed on, a final sales price or the recipients.

Houston asked Babak Nouri to get an independent appraisal. (Docket Entry No. 68-6, Ex. C. Houston Dep., at 20, Tr. 91). On December 4, 2009, Kourosh Zoghi's brother, Kia Zoghi, who worked at Stein Diamonds, appraised the necklace at $12.6 million. (Docket Entry No. 68, Ex. F). Houston testified that Babak Nouri told him that Stein Diamonds was an independent third-party impartial appraiser. (Docket Entry No. 68-6, Ex. C., Houston Dep., at 19, Tr. 90). When Houston questioned Babak Nouri about Stein Diamonds after receiving such a high appraisal, Babak Nouri assured him that the appraisal was independent. (*Id.* at 20, Tr. 91). Houston later learned that Stein Diamonds and L'Amor had some common owners and that the appraiser was Kiaroush Zoghi, Kourosh Zoghi's brother.

### D.    Andypolo Buys the Necklace

Andypolo decided to buy the necklace. Babak Nouri told Houston that the necklace was owned by three entities—L'Amor, Caravan Rug, and Noor Gems International—and that all wanted to sell. (*Id.* at 21, 45; Tr. 92, 183). Houston did not communicate with any of the three alleged owners. (*Id.* at 22, Tr. 94).

On December 7, 2009, Andypolo signed the Purchase Agreement. It identified Caravan Rug, L'Amor, and Noor Gems International as the "Sellers." Andypolo agreed to pay Noor Gems $1.068

6

million; L'Amor $1.950 million; and Caravan Rug $508,000.  The Purchase Agreement contained representations and warranties that each "Seller" had "good and marketable title" to the necklace. The Purchase Agreement identified Babak Nouri as the "Buyer's Representative" and gave him the authority "to accept physical possession of the Necklace . . . and exchange the Executed Documents with Sellers."  (Docket Entry No. 68-3 ¶ 4).  Yahya Noor signed the Purchase Agreement on behalf of Noor Gems International, Refoua signed on behalf of Caravan Rug, and an "Abraham Zoghi" signed on behalf of L'Amor.

On December 8, 2009, L'Amor issued an invoice for the necklace sale to Nouri Antique Rug Gallery in the amount of $1.95 million.  On the same day, L'Amor received confirmation that Andypolo deposited that sum into its bank account.  L'Amor arranged to transfer the necklace to Andypolo.  As far as L'Amor was concerned, the sale was complete.  Andypolo asserts that it never received a valid bill of sale for the necklace.  (Docket Entry No. 68-6, Ex. C, Houston Dep., at 29, Tr. 129).

### E.    L'Amor Did Not Sign the Purchase Agreement

The summary judgment evidence shows that L'Amor had no knowledge of the Purchase Agreement, no involvement in its negotiation, and no awareness of the other two "Sellers" or of the fact that they received over $1.5 million in addition to the $1.95 million Andypolo paid L'Amor. Kourosh Zoghi testified "no one named 'Abraham Zoghi' [was] associated in anyway with L'Amor. No one from L'Amor authorized anyone else to sign the documents on its behalf."  (*Id.* ¶ 11).  "In short, no one from L'Amor knew anything about the existence of the Purchase Agreement and Bill of Sale for the necklace before" receiving papers associated with the law suit.  Kourosh Zoghi was "particularly stunned to see that some entity called 'Noor Gems International, Inc." had received

$1.06 million and that Caravan Rugs had received $508,000 when neither had any ownership interest in the necklace.  (Docket Entry No. 68, Ex. D., ¶¶ 11–12).  There is no evidence controverting L' Amor's sole ownership of the necklace and its lack of awareness of the Purchase Agreement, the presence of, or the payments to, Caravan Rug, Noor, or Noor Gems.

The uncontroverted evidence shows that, contrary to the representations and warranties in the Purchase Agreement, Caravan Rug and Noor Gems had no right, title, or interest in the necklace.  Although this is uncontroverted, the evidence is otherwise confusing and conflicting.  What each of the "Sellers" knew, and believed, what Dr. Bosarge knew and negotiated, and what Houston knew when he signed the Purchase Agreement, are disputed.

### F.    Caravan Rug's Role in the Transaction

When the transaction closed, Caravan Rug demanded and received a  "finder's fee" from L'Amor.  Andypolo paid Caravan Rug $508,000 for its purported ownership interest in the necklace. Refoua testified that he did not know why he was receiving so much money from this transaction. Babak Nouri told Refoua that this was how to structure the deal, and Refoua trusted Nouri.  (Docket Entry No. 68-5, Refoua Depo., at 23, Tr. 89).  After Andypolo paid Caravan Rug, Babak Nouri demanded that Caravan Rug pay $375,720 of the $508,000 that Andypolo paid back to the Nouri Brothers. (Docket Entry No. 68-2, Refoua Aff. ¶ 8).  Refoua also agreed to credit $39,500 from the 508,000 against debts that the Nouri Brothers owed Caravan Rug and agreed to pay Shahram $25,180.  (*Id.*).  Of the $508,000, Caravan Rug netted approximately $57,600.  (*Id.*).

Refoua testified that although he trusted Babak Nouri, the "only way [he was] going to give [Babak Nouri] this money [was] if [he was] released of" liability from the Purchase Agreement.  (*Id.*; Docket Entry No. 68-2, Refoua Aff. ¶ 8).  Refoua testified that he "wasn't comfortable" with

8

the Purchase Agreement.  (Docket Entry No. 68-5, Refoua Dep., at 35; Tr. 156.)  Refoua testified

that he believed the Nouri Brothers were paying for the necklace and that he did not know why they

asked him to pay hundreds of thousands of dollars to others after the transaction closed.  (Refoua

Dep. Tr. 110).  Refoua's demand for a release from liability and admitted discomfort with the

Purchase Agreement call into question his claim of innocent ignorance about Babak Nouri's reasons

for structuring the deal and his belief that a Babak Nouri-owned company was the purchaser.  (*See*

Docket Entry No. 68-2, Refoua Aff. ¶ 9 ("Babak led me to believe that he was purchasing the

Necklace for one of his own Houston business entities.")).

　　　Refoua's demand for a release before paying Babak Nouri led to an "Amendment To

'Purchase Agreement' And Mutual General Release" (the "Amendment and Release").  (Docket

Entry No. 68-4).  The Amendment and Release states that Andypolo had inspected the necklace and

was "satisfied that the necklace and [GIA] certificate [was] authentic and worth the value as

indicated in the Purchase Agreement and Bill of Sale," and that the three "Sellers"—Noor Gems,

Caravan, and L'Amor—were also satisfied with the $3.526 million sales price.  (*Id.*).  Babak Nouri

signed on Andypolo's behalf, agreeing to release Noor Gems, Caravan Rug, and L'Amor from "any

and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, cost and expense.

. . , damages, actions and causes of action, of whatever kind of nature, whether known or unknown,

suspected or unsuspected." (*Id.*).  There is a factual dispute about Babak Nouri's authority to sign

the Amendment and Release for Andypolo. Yahya Noor signed on behalf of Noor Gems, and Refoua

signed on behalf of Caravan Rug.  L'Amor's signature line remained blank.  (*Id.*).  The evidence as

to Caravan Rug's knowledge about the details of this transaction is both confusing and conflicting.

9

### G.      Noor Gems International, Inc.'s Role

Yahya Noor signed the Purchase Agreement and the Amendment and Release on behalf of Noor Gems International, Inc.  Yahya Noor testified that he believed he was signing the documents on behalf of his company, Noor Gems, Inc.  Because he was drunk and did not read English well, he did not notice that the documents misidentified his company as "Noor Gems International, Inc." Andypolo originally sued Noor Gems International, Inc.  In discovery, Andypolo learned that Yahya Noor was the president of Noor Gems, Inc., which had no affiliation with Noor Gems International, Inc., a company that had no role or interest in this transaction or any relationship with the players. Through pleading amendment, Andypolo dropped Noor Gems International, Inc. as a defendant and added Yahya Noor individually.

The summary judgment evidence is unclear as to what Yahya Noor knew about the necklace transaction, why and with what intent he signed the Purchase Agreement, and why Andypolo paid his company over a million dollars.  Noor testified that he was misled into believing that he was being paid for a gemstone that he sold to Babak Nouri.  (Noor Depo. Tr. 50).  Yahya Noor testified that he is from Afghanistan and his first language is Farsi.  (*Id.* at 10).  He did not attend college and cannot speak or read English well.  (*Id.* at 13).  He is a jewelry salesman in Los Angeles, California and owns Noor Gems, Inc.  (*Id.* at 10).  Yahya Noor testified that, in October 2009, Babak Nouri approached him and asked him to locate unique pieces of jewelry for a client.  (*Id.* at 19–20).  Noor did not know Babek Nouri.  The connection was made through Noor's uncle, Nabi Rahmati, who worked at Caravan Rug at the time.  (*Id.* at 20).

Yahaya Noor located two "spinels," gemstones that vary in color from ruby red to black, at Nomads, one of his clients.  In November 2009, Noor went to Houston to show the spinels to Babek

Nouri at the Nouri Antique Rug Gallery.  (*Id.* at 34).  Noor traveled from Los Angeles to the meeting

with Rahmati and a representative from Nomads named "Josh."  (*Id.* at 35).  When they arrived at

the Nouri Antique Rug Gallery, the Nouri Brothers met them and brought them to wait in a private

showroom.  (*Id.* 35–36).  A half-hour later, Dr. Bosarge and his wife entered the private showroom.

(*Id.* at 36).  Noor testified that he had noticed the diamond necklace sitting on a table in the private

showroom, but he had no involvement with any necklace-related discussions.  (*Id.* at 37).  At the

meeting, "Josh" from Nomads answered most of the questions about the spinels.  (*Id.* at 38–39).

When the 45-minute meeting concluded, Noor was told to stay in Houston and that he would be

contacted later about any interest in the spinels.  (*Id.* 39–40).  Noor did not testify that any price

negotiations over the necklace happened at this meeting.  (*Id.*).

    The next day, Babek Nouri contacted Noor and told him that his client wanted to see the

spinels again.  (*Id.* at 40).  Noor, Josh, and Rahmati went back to the Nouri Antique Rug Gallery,

and Noor and Josh brought the spinels back to the private showroom, while Rahmati stayed outside

in the gallery.  Noor testified that Dr. Bosarge and his wife, Babek Nouri, and two other people he

did not know, from Los Angeles, were in the private showroom.  (*Id.* at 42).  He again noticed the

diamond necklace.  At some point, the spinels were left in the showroom with Babek, Dr. Bosarge,

his wife, and the two individuals from Los Angeles.  Babek Nouri had told Josh and Noor to wait

outside while they talked.  (*Id.* at 43).  Noor stated that he did not know what was discussed in the

showroom after he left.  Babek Nouri eventually came out and told Noor that the spinels had been

sold.  (*Id.* at 44).  Noor claims that he never negotiated a sales price for the necklace or the spinels

with anyone at Andypolo and that he talked only to Babek Nouri "about the numbers and

everything."  (*Id.* at 49).

Babak Nouri told Noor that Andypolo was interested in the two spinels and offered to buy both for $5 million.  Babak Nouri later told Noor that Andypolo wanted only one spinel, for $1.218 million.  Noor testified that he sold the red spinel to the "Nouri Gallery."  (*Id.* at 50, 77).  According to Noor, when he signed the Purchase Agreement and received $1.068 million from Andypolo, he believed that money was partial payment for the spinel.  Noor shipped the spinel to Nouri.  Nouri paid Noor an additional $75,000 towards the spinel, but Noor never received the full amount that he believed he had negotiated for that gemstone.  Noor stated that he trusted the Nouri Brothers and that he shipped the stone to them even though they owed the additional $75,000.  Noor testified that he paid Rahmati approximately $410,000, half the profits.  (*Id.* 132).

Noor testified that he did not know that the Purchase Agreement was for the sale of a necklace.  (*Id.* at 77).  He did not realize that in the Purchase Agreement, he represented and warranted that he and his company had an interest in the necklace, or that the Agreement misidentified his company.  According to Noor, Nouri invited him to a hotel, where the two had many drinks.  After Noor was drunk, Nouri insisted that he sign the Agreement.  Noor did so, believing that it was about the spinel.  He testified that he was given only the signature page to sign and never saw the rest of the Purchase Agreement.  (*Id.* at 77).  Noor testified that Refoua made him sign the Amendment and Release.  (*Id.* at 94),  He did not read the that document either, again trusting that it was necessary to complete the sale of the spinel.

Andypolo paints a different view of Noor's relationship with the Nouri Brothers and the Purchase Agreement.  Andypolo argues that Noor orchestrated a direct sale of the red spinel to the Nouri Brothers for $1.218 million, which the Nouri Brothers paid for, in part, with the $1.068 million Andypolo paid Noor under the Purchase Agreement.  This left the Nouri Brothers owing

Noor Gems an additional $150,000, ($75,000 from each brother). At the same time, Noor negotiated a purchase price for the red spinel from its owner, Nomad, for $320,000, resulting in a profit of over $900,000. (*Id.* at 119). Noor split his profits with his uncle, Nabi Rahmati, who had introduced Noor to the Nouri Brothers and helped with the transactions.

Andypolo alleges that Noor knew he was selling the spinel to the Nouri Brothers, not to Andypolo. According to Andypolo, Noor was knowingly complicit in the Purchase Agreement, using it to inflate the necklace price to pay for the spinel that the Nouri Brothers purchased from Noor. Accepting the truth of either Andypolo's assertions or of Noor's explanations as to his role, knowledge, and belief about the necklace transaction requires making credibility determinations to resolve the conflicting summary judgment evidence.

### H.    Andypolo's Other Litigation against the Nouri Brothers

In 2010 and 2011, Andypolo sued the Nouri Brothers over business transactions involving millions of dollars for the purchase and sale of rugs, tapestries, and jewelry. The Nouri Brothers filed a Chapter 7 bankruptcy petition. On July 19, 2012, Andypolo agreed to release the Nouri Brothers from all claims for a total payment of $11,109,750.

These disputes that led to the 2010 and 2011 lawsuits also led Andypolo to investigate the necklace it had purchased in 2009. Andypolo learned that the fair market value of the necklace was substantially less than what had been represented and paid. Andypolo also learned that neither Caravan Rug nor Noor Gems had an ownership interest in the necklace, yet Andypolo had paid them over $1.5 million. Andypolo learned that the only owner, L' Amor, had been willing to sell for $1.5 million less than Andypolo had paid.

### I.    This Litigation

In December 2012, Andypolo sued Caravan Rug, L'Amor, Noor Gems International, and Stein Diamonds. (Docket Entry No. 1). Andypolo's Third Amended Complaint is against Caravan Rug, Yahya Noor, Shahram (last name unknown), and Mohamad Nabi Rahmati. (Docket Entry No. 43). As noted, Andypolo dismissed its claims against Noor Gems International after it learned that Yahya Noor's company was Noor Gems, Inc., which is not related to Noor Gems International.

The Third Amended Complaint alleges that Caravan Rug, its business associate Shahram (last name unknown), the Nouri Brothers, Yahya Noor, and Noor's uncle, Mohamad Nabi Rahmati, conspired to dupe Andypolo into buying the necklace for $3.5 million, $1.5 million more than it was worth and more than the sole owner was willing to accept. Caravan Rug received approximately $500,000 of the excess profit and kicked back more than $300,000 to the Nouri Brothers. Yahya Noor received $1.068, which the Nouri Brothers used as payment to Noor Gems for the red spinel.

The Third Amended Complaint alleges in Count One that Caravan Rug breached the Purchase Agreement and Bill of Sale; in Count Two, that all defendants committed fraud and made fraudulent misrepresentations, and in Count Three, that all defendants aided and abetted the Nouri Brothers to breach the fiduciary duties they owed Andypolo. Count Four asserts an unjust enrichment claim against all defendants, and Count Five is a civil conspiracy claim.

## II.    The Applicable Legal Standards

### A.    Motions to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible

on its face." *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'"  *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'"  *Id.* (quoting *Twombly*, 550 U.S. at 558).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with

prejudice, unless it is clear that to do so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

### B.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402

16

F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.  Discussion

### A.  Andypolo's Motion for Summary Judgment as to Caravan's Contract-Based Counterclaims

Caravan Rug counterclaimed for breach of contract and for declaratory relief. (Docket Entry Nos. 32, 50). Caravan Rug alleged that it had "fulfilled its obligations under the Amendment by delivering the Necklace to Andypolo in exchange for the agreed purchase price." (*Id.* ¶ 171). Caravan Rug alleged that by filing this lawsuit, Andypolo breached the Amendment and Release to the Purchase Agreement. Caravan Rug's claim for declaratory relief asks the court to find that the Amendment and Release was valid and enforceable and that title to the necklace passed "free and

17

clear" from L'Amor to Andypolo.  Andypolo moved for summary judgment dismissing the counterclaims.  Caravan Rug responded, and Andypolo replied.

A breach of contract claim requires the "existence of a valid contract between the plaintiff and defendant."  *In re Stanley*, 320 S.W.3d 490, 499 (Tex. App. –Dallas 2010, no pet.).  "When reviewing written negotiations, the question of whether an offer was accepted and a contract was formed is primarily a question of law for the court to decide."  *Scaife v. Associated Air Ctr., Inc.,* 100 F.3d 406, 410 (5th Cir.1996).  "If an agreement has been reduced to writing, as it [is] in this case, an assent to the writing must be manifested."  *Id.*  "A party's signature on a contract is 'strong evidence' that the party unconditionally assented to its terms."  *In re Citgo Petrol. Corp.*, 248 S.W.3d 769, 774 (Tex. App. -Beaumont 2008) (quoting *In re Dec. Nine Co., Ltd.* ., 225 S.W.3d 693, 699 (Tex. App. -El Paso 2006, orig. proc.)).  "[B]lank signature lines are not proof, by themselves, that the parties required formal signatures for a contract to be binding."  *Tricon Energy Ltd. v. Vinmar Intern., Ltd.,* 718 F.3d 448, 454 (5th Cir.2013).  "When a party's signature is not present, other evidence may be relied on to prove the party's unconditional assent." *Id.* "If one party signs a contract, the other party's acceptance may be demonstrated by its conduct, thus making it a binding agreement on both parties."  *Id.* (quotation omitted).  "The issue of whether the parties required that the agreement be signed to be considered binding is one of intent, and, therefore, the issue is normally a fact question for the jury to decide."  *Id.* (quotation omitted).  But when the contract is reduced to writing, "the question of whether an offer was accepted . . . is primarily a question of law for the court to decide."  *Scaife*, 100 F.3d at 410. The Purchase Agreement states that"[n]o amendment or modification . . . shall be valid unless made in writing and signed by all of the parties hereto."  (Docket Entry No. 48-1 ¶ 12).

18

The Amendment and Release states:

> All . . . execute this Agreement with reference to the following recitals:
>
> A.      Prior to the date hereof The Parties hereto had engaged in a purchase / sale transactions of a necklace which was memorialized through A PURCHASE AGREEMENT and BILL IF SALE dated December 14, 2009.
>
> B.      The Parties now wish to rescind and void the PURCHASE AGREEMENT and BILL OF SALE and replace it with the within agreement.

(Docket Entry No. 48-3).  The Amendment and Release states that the parties—Andypolo, Noor Gems International, L'Amor, and Caravan—agreed that everyone was satisfied with the value of the necklace and the final sales price and that "[e]xcept for the express promises and covenants of the Parties pursuant to the terms of this Agreement," Andypolo, Noor Gems International, L'Amor, and Caravan Rug Corp. released one another from any liabilities "of whatever kind or nature, whether known or unknown, suspected or unsuspected." *Id.*  The Amendment and Release to the Purchase Agreement includes a signature line for each party, including L' Amor Jewelry, Inc.  L' Amor's line is blank.

Andypolo argues that the Amendment and Release is invalid because L'Amor did not sign it.  The court agrees.  The Purchase Agreement clearly required all parties to sign for a effective amendment or modification.  The preamble to the Amendment and Release states that its purpose was to void and replace the Purchase Agreement.  The Amendment and Release had signature blocks for all the parties to the Purchase Agreement, but L'Amor did not sign.  The terms of the Purchase Agreement make the Amendment and Release invalid.  "[T]he parties contemplated the formation of a binding [amendment] to include the signatures of [all] parties." *Scaife*, 100 F.3d at 411.  The

Amendment and Release was a contract that was never "formed and, as a result, summary judgment [is] appropriate in this case." *Id.*

Caravan Rug argues that the Amendment and Release was not a modification or amendment to the Purchase Agreement. Instead, according to Caravan Rug, the Amendment and Release was separate from the Purchase Agreement and not subject to its requirement that all parties sign. Caravan Rug relies on *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 313 (Tex. 1999). In that case, the Texas Supreme Court agreed that "a release of liability is not an agreement to modify a contract but is an agreement to completely relinquish the parties' performance of obligations to each other." *Id.* Caravan Rug lifts that sentence out of context. The case does not stand for the proposition that a release from liability is always separate and independent from an underlying contract so as not to be subject to conditions for modification set out in the original contract.

In *El Paso*, Minco had entered into agreements in the 1970s, with El Paso Natural Gas that included "take-or-pay" clauses. These clauses required El Paso either to purchase a minimum quantity of gas or pay Minco the difference between the quantity actually purchased and the minimum purchase required. In the 1980s, oil prices sharply declined. El Paso decided that it no longer wanted to continue buying gas from Minco under the take-or-pay provisions of the contract. El Paso executed "various amendments to the agreements that reduced El Paso's take-or-pay obligations and granted El Paso the right to unilaterally reduce the price it paid for gas." *Id.* at 311. In addition, El Paso entered into a series of monthly releases (over 80 in all) that, among other things, excused El Paso from that month's take-or-pay obligations. Finally, in 1988, Minco requested and received from El Paso a final termination of its agreement and a mutual release of

liabilities.  "Under this termination letter, El Paso and Minco released each other 'from any and all claims, causes of action or liability that may have existed concerning the Agreement.'"  *Id.*

In 1992, Minco sued El Paso under the original take-or-pay provisions.  Minco argued that the releases were invalid because El Paso obtained them in bad faith.  El Paso responded that the parties had mutually released all claims through the amendments, monthly releases, and termination letters.  The Texas Supreme Court, analyzed whether the UCC-imposed duty of good faith and fair dealing in the performance, enforcement, and modification of a commercial contract applies to agreements releasing liability from obligations imposed in an earlier contract.  *Id.* at 313.  Minco argued that the UCC-imposed duty applied to all of the parties' agreements, including the final termination letter.  El Paso argued that the duty applied only to the "enforcement and performance" of a contract, including "modifications" of its terms, but not to contract "formation."  El Paso reasoned that the final release of liability was neither the "enforcement and performance" of the contract nor a "modification" of its terms, but rather the "formation" of a separate contract releasing the parties' obligations to each other.  The UCC-imposed duty of good faith and fair dealing did not apply.

The Texas Supreme Court agreed with El Paso.  It concluded that the UCC required El Paso to act fairly and in good faith in the performance, enforcement, and modification of its agreements with Minco, but that the duty did not apply when El Paso "procured" or "formed" the new release agreements.  The duty of good faith did "not extend to the formation of a contract," including the releases because "releases are contracts."  *Id.*  While the UCC requires parties to act in good faith in performing, enforcing, or modifying a contract for the sale of goods, it does not create a statutory duty between parties negotiating a release from liability arising under that contract.

21

Caravan Rug's analysis of *El Paso* strains the extent of that case's holding and the language of the Purchase Agreement and the Amendment and Release. The Purchase Agreement contained representations and warranties, which the Amendment and Release purportedly voided and replaced. The Amendment and Release stated that the Purchase Agreement was void and that every party to the Purchase Agreement released all of the other parties from any liabilities under the Agreement. The Purchase Agreement was between Andypolo and three sellers and required the signatures of all parties for any effective modification. The Amendment and Release lacked a signature from L'Amor. Even if, as in *El Paso*, the Amendment and Release is treated as a "separate contract" that had to meet the requirements of contract formation, which is not subject to the duty of good faith and fair dealing, that does not avoid the signature requirement imposed by the Purchase Agreement.

Caravan Rug's argument that the Amendment and Release is effective and enforceable as to the parties who did sign, even if unenforceable against L'Amor, is unpersuasive. The Purchase Agreement included joint and several representations and warranties that created liability for all of the sellers for any one seller's misrepresentations. Caravan Rug's argument would mean that the Amendment and Release would relieve two of the three sellers from any liability—leaving the third seller, L'Amor, on the hook for all liability. The Amendment and Release was subject to the Purchase Agreement requirement that all parties sign. The terms of both the Purchase Agreement and the Amendment and Release preclude treating the Amendment and Release as wholly unconnected from the Purchase Agreement it purported to amend by declaring it rescinded and void. *See, e.g.*, *Dixon v. Brooks*, 678 S.W.2d 728 (Tex. App. –Houston [14th Dist.] 1984, writ ref'd n.r.e.).

Andypolo's motion for summary judgment dismissing Caravan Rug's contract-based counterclaims is granted. (Docket Entry No. 49). To the extent Caravan Rug seeks a declaratory

22

judgment that the Amendment and Release was a valid and enforceable contract, that counterclaim is dismissed as well.

**B.      Andypolo's Motion for Summary Judgment as to Yahya Noor's Counterclaims**

Yahya Noor also counterclaimed against Andypolo, alleging that the lawsuit breached the "Amendment to the Purchase Agreement and Mutual General Release"  and seeking a declaratory judgment that the Amendment and Release was valid and enforceable and that title to the necklace passed free and clear from L'Amor to Andypolo.  (Docket Entry No. 54).  Andypolo moved for summary judgment dismissing Yahya Noor's counterclaims, (Docket Entry No. 60), Yahya Noor responded,  (Docket Entry No. 75), and Andypolo replied, (Docket Entry No. 81).

For the reasons explained above, the Amendment and Release to the Purchase Agreement was not a valid, enforceable contract.  Andypolo's motion for summary judgment dismissing Noor's contract counterclaim is granted.

The court need not reach Andypolo's alternative argument that Yahya Noor lacks standing to assert his contract claim on behalf of the signatory company, Noor Gems International.  Andypolo also moved for summary judgment dismissing Noor's counterclaim for a declaratory judgment that the Amendment and Release was valid and enforceable.  The motion is granted because the court has granted Andypolo's motion for summary judgment on the underlying,  mirror-image, substantive claim.

Andypolo also moved for summary judgment dismissing Noor's counterclaim for a declaratory judgment that because good and marketable title to the necklace passed to Andypolo, there is no basis for Andypolo to recover.  Andypolo argues that this declaratory-relief claim is simply a mirror image of its own claims and should be dismissed as duplicative.

23

Andypolo sued all of the defendants under the Purchase Agreement, alleging that Noor Gems and Caravan Rug lacked ownership or title to the necklace and that Andypolo paid them for interests that neither possessed.  Noor seeks declaratory judgment that the necklace "passed free and clear from L'Amor to Andypolo, as there is no third-party claiming title to the Necklace other than Andypolo."  This is either duplicative of Andypolo's breach of contract and fraud claims, or it is irrelevant to the disputed issues in this suit.  Andypolo does not dispute that it received the title from the owner, L'Amor.  Nor does Andypolo assert that anyone challenges its title.  The disputed issues are whether the contract price for the necklace was fraudulently inflated by misrepresentations leading Andypolo to believe that it had to pay two additional "Sellers," who had no title or ownership interest, $1.5 million more than the actual and only owner demanded and received.

"A declaratory judgment action is merely a vehicle that allows a party to obtain 'an early adjudication of an actual controversy' arising under other substantive law."  *Islamic Ass'n of De Soto, Tex., Inc. v. Mortg. Elec. Regis. Sys., Inc.*, No. , 2013 WL 169229, at *8–*9 (N.D. Tex. Jan. 16, 2013) (citing *Collin Cnty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 170 (5th Cir. 1990)).  "Federal courts have broad discretion to grant or refuse declaratory judgment."  *Id.* (citing *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991)). The Declaratory Judgment Act is "'an authorization, not a command'" and "does not impose a duty" on federal district courts  to declare the rights of parties.  *Id.* (citing *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)).  To the extent that Noor seeks a declaratory judgment that Andypolo got what it paid for, that will be litigated and decided under the substantive claims that Andypolo has asserted against Noor and the other defendants.  To the extent Noor seeks a declaratory judgment that Andypolo received title from L'Amor, that is irrelevant to the claims in

Andypolo's Third Amended Complaint.

This court dismisses the declaratory judgment claim because it seeks relief that is either duplicative of the claims that Andypolo has already asserted, *see* 6 Charles Alan Wright, et al., Federal Practice and Procedure § 1406, at 30–31 (3d ed. 2010) ("When the request for declaratory relief brings into question issues that already have been presented . . . a party might challenge the counterclaim on the ground that it is redundant and the court should exercise its discretion to dismiss it."), or irrelevant.  Andypolo's motion for summary judgment on Noor's counterclaims is granted. (Docket Entry No. 60).

### C. Andypolo's Motion to Dismiss Noor Gems, Inc.'s Counterclaims

Noor Gems, Inc. asserted the same counterclaims as Noor and Caravan Rug.  Andypolo has moved to dismiss or for summary judgment dismissing Noor Gems, Inc.'s counterclaims. (Docket Entry No. 61).

Andypolo moved to dismiss the counterclaim that it breached the Amendment and Release by suing, because Andypolo did not sue Noor Gems, Inc.  Andypolo dropped Noor Gems International from the suit after learning that it had no involvement. Andypolo has sued Yahya Noor, not Noor Gems, Inc.  Assuming the Amendment and Release was a valid contract, which it was not, Noor Gems cannot claim this lawsuit was a breach because Noor Gems was not sued.

Andypolo also moved for summary judgment on this counterclaim because the Amendment and Release was not a valid contract.  This court has already ruled that the Amendment and Release is not valid or enforceable.  Andypolo's motion for summary judgment is granted.  This resolves the counterclaim for a declaratory judgment that Andypolo breached the Amendment and Release, which is also dismissed.

25

Finally, the counterclaim for a declaratory judgment that good and marketable title passed to Andypolo from L'Amor is also dismissed as either duplicative or irrelevant.

The court grants Andypolo's motion for summary judgment on Noor Gems, Inc.'s counterclaims. Andypolo's motion to dismiss is moot.

### D.       Yahya Noor's Motion for Summary Judgment Dismissing Andypolo's Claims

Yahya Noor moved for summary judgment on Andypolo's claims for fraud, breach of contract,[1] conspiracy, and aiding or abetting the breach of the Nouri's fiduciary duties. Noor asserts that Andypolo suffered no injury or damages because it received the necklace it contracted for at the price it agreed to pay.

The summary judgment evidence, however, does not establish what representations were made when Andypolo agreed to pay the three "Sellers" the $3.526 million price set out in the Purchase Agreement. Noor maintains that Andypolo negotiated and agreed on the $3.526 million sales price at the Houston meeting. The excerpts from Houston's deposition that Noor cites do not establish the factual narrative that Noor asserts to be true. Houston stated that he could not remember what he was told about the meeting. The little he knew he had heard from Dr. Bosarge. The testimony that both parties rely on is hearsay, disputed, and unclear. Contrary to Noor's argument, Houston stated that a price was not agreed on at the meeting. (Houston Dep. Tr. 223). Houston testified that Babak Nouri told him what the final sales price would be.

Kourosh Zoghi also stated that the only price negotiations L'Amor participated in occurred through Babak Nouri. Zoghi's declaration stated that the negotiations were conducted through Babak Nouri and that L'Amor agreed to a $1.95 million sales price. (Zoghi Decl. ¶ 5). It appears

---

[1]  Andypolo does not assert a breach of contract claim against Noor.

that L'Amor, the actual and only owner of the necklace, did not know anything about the Purchase Agreement or the inflated sales price.  There are material factual disputes that preclude granting Noor's motion for summary judgment on a "no injury" theory.

Noor argues that even if Andypolo was harmed by the difference between what it paid to the three purported "Sellers" and what L'Amor received, Andypolo cannot recover as a matter of law because what Andypolo might have paid to L'Amor alone for the necklace is "hypothetical."  Noor's argument is unpersuasive.

Under Texas law, which governs the Purchase Agreement, a plaintiff may recover out-of-pocket expenses that are a part of the "*actual injury* suffered measured by the difference between the value of that which he has parted with and the value of that which he has received." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).  The summary judgment evidence shows that L'Amor sold the necklace for much less than Andypolo paid, and that Andypolo was fraudulently induced into signing a contract to purchase the necklace at an inflated price.  Noor's argument is not a basis to grant his motion for summary judgment because of the genuine and material factual disputes as to each defendant's role and knowledge.

Noor argues that the Purchase Agreement defines "Sellers" as L'Amor, Caravan Rug, and Noor collectively, and the statement that the "Sellers" have good and marketable title to the necklace that statement is true because one of them—L'Amor— did have good and marketable title.  This argument proves too much.  It assumes that Caravan Rug and Noor were properly paid over $1.5 million for selling. . . nothing.  It also ignores the Purchase Agreement's Representations and Warranties of Sellers, which state that "Sellers, jointly and several, represent and warrant [that the] Sellers have good and marketable right, title, and interest in and to the Necklace." (Agreement ¶

27

6(a)).

Noor argues that Andypolo cannot recover on its tort claims because it did not justifiably rely on the parties' representations.  The record does not support this argument.  For example, David Houston testified that he believed more than one entity owned the necklace.

Finally, Noor argues that Andypolo's claim of unjust enrichment is precluded by its contract claim and the statute of limitations.  But Andypolo does not bring a breach of contract claim against Noor and seeks unjust enrichment only as a tort remedy.  The statute of limitations is not a basis to grant summary judgment.  The discovery rule applies given the allegedly fraudulent actions designed to conceal the facts as to ownership and price.  The discovery rule tolled the statute of limitations, making the claims timely.  Andypolo has demonstrated that the nature of the fraud prevented discovery of the facts giving rise to the claims.  In its brief, Andypolo points to evidence as to how the defendants' actions precluded discovery of the claims.  Summary judgment for Noor dismissing all of Andypolo's claims is inappropriate because of the clear terms of the Purchase Agreement and the material factual disputes.[2]

Noor also moved for summary judgment on his counterclaims.  The court previously granted Andypolo's motion for summary judgment on these counterclaims.  Noor's motion for summary judgment is denied.

### E.    Caravan Rug Corporation's First Amended Motion to Dismiss

Caravan Rug moved to dismiss Andypolo's claims against it under Federal Rule of Civil Procedure 12(b)(1), for lack of a cognizable injury or case in controversy.  (Docket Entry No. 66).

---

[2] Noor's reply brief highlights why the summary judgment he seeks cannot be granted.  Noor states that it is "undisputed that Noor was led to believe by plaintiff Andypolo, through its agent Babak Nouri, that plaintiff would be buying two gemstones (spinels) from Noor for $5 million."  Factual disputes abound.

Andypolo responded.  (Docket Entry No. 78).

Caravan Rug's sole argument is that Andypolo received the benefit of the bargain because it got the necklace it wanted at the price it agreed to pay, removing any basis to find injury.  This argument ignores the claims that the Purchase Agreement was the result of a straw transaction that fraudulently inflated the price, injuring Andypolo.  Andypolo paid Caravan Rug over $500,000 for its purported ownership interest in the necklace.  The Purchase Agreement represents and warrants that Caravan Rug has good, marketable title to the necklace.  Uncontroverted summary judgment evidence shows that Caravan Rug had no title or ownership interest in the necklace to sell. Andypolo claims that it would never have paid $500,000 for a nonexistent ownership interest and that Caravan Rug breached the representations and warranties it made in the Purchase Agreement. Andypolo has alleged a cognizable injury sounding in tort (for fraud and fraudulent inducement) and for breach of contract (for breaching contractual representations and warranties).  Caravan Rug construes Andypolo's claim as one over title, but that both oversimplifies and misses the point.  The claim is over the amount paid for the necklace and the representations and events surrounding the Purchase Agreement.  Caravan Rug's motion to dismiss is denied.

**F.   Andypolo's Motion for Summary Judgment on the Contract Claim against Caravan and Caravan's Cross-Motion for Summary Judgment**

Andypolo moved for summary judgment on its breach of contract claim against Caravan. (Docket Entry No. 58).  Andypolo argues that it is undisputed that Caravan Rug represented and warranted in the Purchase Agreement that it had an ownership interest that it did not have. Andypolo also argues that it is undisputed that Caravan Rug was paid over $500,000 for an ownership interest that never existed, in breach of the Purchase Agreement.  In response, Caravan Rug argues that the motion must be denied because Andypolo got the necklace at the price it agreed to pay and because

29

any alleged damages are too speculative to support recovery.  Additionally, Caravan Rug argues that

Andypolo, through Babak Nouri, signed a release that precludes this lawsuit.

The court has already addressed, and rejected, each of these arguments.  It is undisputed that

Andypolo paid at least $500,000 more than L'Amor's selling price.  It is also undisputed that

Andypolo paid Caravan Rug for an ownership interest that it did not have.  Andypolo received no

"benefit" from its bargain with Caravan Rug.  Finally, the Amendment and Release was invalid

because it lacked L'Amor's signature.  Andypolo's motion for summary judgment on the breach of

contract claim is granted; Caravan Rug's cross-motion is denied.

### G.   Caravan Rug's Motion for Summary Judgment Dismissing Andypolo's Claims

Caravan Rug moved for summary judgment on all of Andypolo's claims.  (Docket Entry No.

71).  Caravan Rug seeks summary judgment dismissing Andypolo's breach of contract claim

because Andypolo suffered no injury and damages are too speculative.  Caravan Rug argues that it

is entitled to summary judgment on the claims of aiding and abetting the Nouri Brothers' breach of

their fiduciary duties because there is no evidence to support the claim and Andypolo has not

suffered any injury or damages.  Caravan Rug argues that it is entitled to summary judgment on the

unjust enrichment claim due to the statute of limitations and Andypolo's attempt to recover in

contract. Finally, Caravan Rug argues that the conspiracy claim is not supported by a viable tort

claim.  Each of these arguments merely repackage the arguments asserted in the previously analyzed

summary judgment motions.

Caravan Rug argues that Andypolo has not shown that it has suffered any injury or damages

because it received the necklace it wanted at the bargained-for price, L'Amor was paid, and L'Amor

is not claiming title.  The Purchase Agreement clearly represented that Caravan Rug had an

ownership interest in the necklace and that Andypolo purchased that ownership interest for approximately $500,000. It is uncontroverted that Caravan Rug had no ownership interest in the necklace. The evidence shows that Andypolo paid approximately $500,000 for something Caravan Rug did not have to sell.

Caravan Rug also argues that the damages are speculative. But the damages Andypolo asserts are not speculative lost profits. It is undisputed that Andypolo paid Caravan Rug $500,000 for something Caravan Rug did not have to give, and that Andypolo did not need to obtain title to the necklace. The owner's initial asking price was $2.2 million; Andypolo paid $3.526 million. Presumably, Andypolo would not have negotiated a higher price than the seller originally asked for. The court denies Caravan Rug's motion for summary judgment dismissing Andypolo's fraudulent inducement claims

The court addressed and rejected the arguments Caravan Rug offers in support of its motion for summary judgment dismissing the breach of contract claim when it granted Andypolo's motion for summary judgment on the breach of contract claim. Caravan Rug's motion for summary judgment on the breach of contract claim is denied.

Caravan Rug argues that the court should grant its motion for summary judgment because there is no evidence that Caravan Rug knowingly participated in Nouri Brothers' alleged breach of fiduciary duties. The disputed facts preclude this ruling. Refoua testified that he was so uncomfortable with the Purchase Transaction that he had Babak Nouri draft a contract that released him from liability. Where Refoua believed Babak Nouri was purchasing the necklace for himself or one of his own entities is disputed. The court denies Caravan Rug's motion for summary judgment on Andypolo's aiding and abetting the breach of fiduciary duty claim.

31

Caravan Rug argues that the statute of limitations bars the unjust enrichment claim. However, the discovery rule tolled the statute of limitations, making the claims timely. Andypolo has demonstrated that the nature of the fraud prevented discovery of the facts necessary to state a claim. In its brief, Andypolo points to evidence as to how the defendants' actions precluded discovery of the claims, and Caravan Rug does not contest this showing in its reply. Andypolo argues that it was not until May 26, 2013 that L'Amor provided the evidence that Caravan Rug never owned the necklace; that the actual sales price was only $1.95 million; and that Caravan Rug sold Andypolo nothing. Caravan Rug first admitted to making kickbacks to the Nouri Brothers in August 2013. Caravan Rug first produced the purported Amendment and Release in April 2013. The statute of limitations was tolled and is not a basis to grant summary judgment for Caravan Rug.

Finally, unjust enrichment is asserted as a basis to recover the tort damages that Andypolo asserts. The court denies Caravan Rug's motion for summary judgment on the unjust enrichment claim for the reasons explained above. *See Formosa Plastics Corp.*, 960 S.W.2d at 47.

Caravan Rug has also moved for summary judgment on its counterclaims against Andypolo. The court granted Andypolo's motion for summary judgment dismissing Caravan's counterclaims, and denies Caravan Rug's motion.

## IV.    Conclusion

The court:

1.      grants Andypolo's motion for partial summary judgment dismissing Caravan Rug's contract-based counterclaims, (Docket Entry No. 48);

2.      grants Andypolo's motion for summary judgment dismissing Yahya Noor's and Noor Gem's counterclaims, making Andypolo's alternative motion for summary judgment moot, (Docket Entry No. 60, 61);

3.      denies Yahya Noor's motion for summary judgment dismissing Andypolo's

32

claims, (Docket Entry No. 63);

4.      denies Caravan Rug's motion to dismiss the complaint, (Docket Entry No. 66);

5.      grants Andydpolo's motion for summary judgment on its claims against Caravan Rug, (Docket Entry No. 58); and

6.      denies Caravan Rug's motion for summary judgment dismissing Andypolo's claims, (Docket Entry No. 71).

A status and scheduling conference is set for **September 19, 2014 at 8:30 a.m.**

        SIGNED on August 28, 2014, at Houston, Texas.

                                Lee H. Rosenthal
                        United States District Judge